## Roberts's Appeal.    Thomson's Estate.

1. A testator devised his estate to trustees, to be subject to payments as follows: " First. To so much of the proceeds of said property as my dearly beloved wife may deem necessary for the maintenance of herself and my dear niece ; they living in such style as my said wife may think best to promote their happiness and comfort during her lifetime. If my niece should survive my wife, then I direct that there shall be paid to her, as long as she may live, the sum of two thousand dollars per annum. To my wife I give absolutely all my household furniture, books and ornaments." By a codicil he directed : " I desire my dear niece, L. F., but to whom I cherish the feelings of a father, to be so treated and regarded in the law as if she were really my child, receiving during her lifetime such income from my estate as if she were really my child, and I postpone the operations of the trusts of my will, so as fully to effect this result, until her decease ; upon which event they are forthwith to take full effect, as expressed in the will." And by a second codicil directed : " The codicil which I added to my will the other night, May 24th, means that I wish my niece, C. F. F., to be considered as my daughter, and to take, out of the income of my estate, all that she requires to render her more than comfortable in her housekeeping during her lifetime. I do not desire to postpone by it the operations of the trusts of my will, except so far as may be necessary to secure the above object." *Held*, that by the word " proceeds" the testator meant income. *Held, further*, that the trustees could not limit the claim of the widow to what they might consider judicious ; that the widow and niece were entitled to the whole income if, in their discretion, they required it.

2. T. and A. were joint owners of real estate, T. holding the title. He made sale of the lands, and mingled the money received therefor with his own. *Held*, that upon a settlement of his account with his co-tenant he was chargable with interest on the amounts received, and also with interest upon said interest. Money thus received is trust money, and the rules which forbid the allowance of interest upon interest between debtor and creditor do not apply.

3. P. purchased certain lands and paid cash therefor. T. agreed to purchase one-fourth of these lands and pay cash therefor. P. gave T. a receipt in full as for cash, which receipt was duly witnessed, and set forth that one-fourth of the purchase-money had been furnished by T. Instead of cash P. took from T. a due-bill, payable at once. *Held*, that the receipt was a sufficient declaration of trust and might be recorded as such. *Held, further*, that T. could not make defence to the due-bill on the ground that P.'s representatives could not make an unencumbered title. Roland *v.* Tiernan, 8 W. & S. 193, followed.

4. Decedent was a member of an unincorporated association organized to build, equip and operate a certain railroad. Some of the partners contracted to purchase the entire stock of a competing road. *Held*, that said contract was not within the scope of the authority of those making it and not binding upon decedent's estate.

5. It was alleged that an unauthorized contract of some of his copartners had been ratified by decedent. *Held*, that to make him liable his assent to the precise provisions of the contract must be shown.

6. In the settlement of an account of trustees various claims were presented, but in the disposition of them the Orphans' Court made but one decree. The accountants took a separate appeal for each claim. *Held*, that this was improper and there should have been but one appeal therefrom.

[Roberts's Appeal.]

February 4th 1879, and January 9th and 29th 1880.   Before
SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and
STERRETT, JJ.   GREEN, J., absent.

Appeals from the Orphans' Court of *Philadelphia county:* Of
January Term 1879, Nos. 105–109, inclusive.

Appeals of George B. Roberts and William M. Spackman, two
of the trustees under the will of John Edgar Thomson, deceased,
and of the same persons and the Philadelphia Trust Company,
administrators c. t. a. of the estate of said d.cedent from the
decree of said court.

John Edgar Thomson, by his will dated December 20th 1871,
provided as follows :

"I give and bequeath all of my real and personal estate, except
household furniture, to Lavinia F. Thomson, George B. Roberts
and William M. Spackman, in trust : the income from which shall
be devoted to the purposes hereinafter mentioned.

"The said trustees to have full power to sell any of my property,
and re-invest the proceeds whenever in their judgment, the interest
of the trust will be promoted thereby.   The estate to be subject to
the following payments : First, To so much of the proceeds of said
property as my dearly beloved wife, Lavinia F. Thomson, may
deem necessary for the maintenance of herself and my dear niece,
Charlotte F. Foster, they living in such style as my said wife may
think best to promote their happiness and comfort during her life-
time.   If my niece, Charlotte F. Foster, should survive my wife,
then I direct that there shall be paid to her as long as she may
live, the sum of $2000 per annum.   To my wife, Lavinia F. Thom-
son, I give absolutely all of my household furniture, books and
ornaments."

After bequeathing certain legacies he further directed :

"The said trustees to appropriate the remainder of the net
income of my estate, after the payments above specified, or so much
of it as may be judiciously applied thereto, to the education and
maintenance of female orphans of railway employees, whose fathers
may have been killed while in the discharge of their duties : pre-
ference to be given, first, to the orphans of the employees engaged
upon the Pennsylvania Railroad ; second, to those of the Georgia
Railroad, between Augusta and Atlanta, Georgia ; third, to those
of the lines controlled by the Pennsylvania Railroad Company by
lease or otherwise ; fourth, to those of the employees of any other
railroad company of the United States of America."

Three days before his death, on May 24th 1874, in his last ill-
ness the testator executed the following codicil :

"This is a codicil to my last will and testament, made in sick-
ness of body, but with a clear understanding and full testamentary
intention.   I desire my dear niece, Lottie Foster, but to whom I
cherish the feelings of a father, to be so treated and regarded in

the law as if she were really my child, receiving during her lifetime such income from my estate as if she were really my child; and I postpone the operation of the trusts of my will, so as fully to effect this result until her decease, upon which event, they are forthwith to take full effect as expressed in the will."

And two days thereafter, on May 26th 1874, executed the following additional codicil:

" The codicil which I added to my will the other night, May 24th, means, that I wish my niece, Charlotte F. Foster, to be considered as my daughter, and to take out of the income of my estate, all· that she requires to render her more than comfortable in her housekeeping during her lifetime.

" I do not desire to postpone by it the operations of the trusts of my will, except so far as may be necessary to secure the above object."

The account of the administrators was referred to Joseph A. Clay, Esq., as auditor. Before him Mrs. Thomson and Mrs. Reed made a joint claim alleging, that under the provisions of the will, they were entitled to the whole income of the estate. The auditor allowed them a certain sum per year, which was about one-half the net income of the estate, being of the opinion, that this was enough for their maintenance in " such style " as was intended by the will, and that said amount was all to which they were entitled. The court, Hanna, P. J., sustained the exceptions to this allowance, in an opinion, inter alia, saying:

" We are of the opinion, that testator has conferred upon his wife, and after her death, upon his niece, an absolute and unfettered discretion, as to the proportion of the income of the estate they will respectively require for their maintenance, and· upon the exercise of which, the court has no authority to impose any restrictions. This we consider to have been in the mind of the testator, and to form the scheme of his will.

" We are, therefore of the opinion that the balance of the principal of the estate should be awarded to the trustees, to be held and applied to the uses and purposes of the trusts declared by testator, and that the balance of the income, after the payment of the legacies bequeathed, should also be awarded to the trustees for the payment of the annuities, and to the widow of testator of such sum or sums as she, in her discretion, may require for the mainance of herself and niece, now Mrs. Charlotte F. Reed, the balance of the income, if any, to be expended in support of the charitable trust declared in the will."

The accountants took an appeal from this decree to 106 January Term 1876.

At the audit, Mrs. E. B. Mitcheson, executrix of Catherine Alexander, who was executrix and sole devisee under the will of William G. Alexander, deceased, made a claim for interest on

money received by Mr. Thomson from sales of land. Mr. Thomson and Mr. Alexander bought a tract of land in the borough of Huntingdon, Pennsylvania. The land was conveyed by William Dorris, Jr., and wife, to Mr. Thomson, by deed dated January 1st 1855. Mr. Thomson, on the 30th of June 1858, executed a deed of trust to Mr. Alexander, declaring that Mr. Alexander was entitled to one-fourth of the property. Afterwards a portion of the property was sold by Mr. Thomson, and on the 21st of May 1872, he paid to Mrs. Mitcheson, the claimant, $11,967.35. Sales had been made several years previously. Interest was claimed at the time of the payment on the various sums received by Mr. Thomson from the time of the receipt, which he refused to pay, and the fund was then taken reserving the question of interest. This claim was made before the auditor and allowed the interest amounting to $3441.77. Upon this sum interest was also claimed from the day of settlement, which claim the auditor refused, and the claimant excepted. The court sustained the exceptions, saying :—

"The exceptions to the award by the auditor of the claim of the estate of William G. Alexander, deceased, are to his refusal to allow interest upon the amount found to be due by decedent as interest upon principal moneys in his hands at the date of his settlement with and payment of said principal moneys to the claimant on May 21st 1872. It is not disputed that on said date decedent paid to claimant the sum of $11,976.35, exclusive of the interest thereon, amounting to $3262.62, which claimant received, but reserving her right to demand the interest. The auditor has awarded payment of the amount of interest due decedent, but refused to allow interest thereon for the reason that it would be compounding the interest. But in this conclusion we think the auditor was mistaken. The amount of interest, computed to the day of settlement, and which the deceased wrongfully withheld, was as much a debt to the claimant as the principal moneys in his possession, and his liability, therefore, was as conclusive ; and being a debt then due and payable, it bears interest until paid. It cannot be doubted, if decedent had given claimant his promissory-note, due-bill, or other evidence of indebtedness for the amount of the interest, the same would bear lawful interest. We therefore cannot consider this claim as analogous to a demand for compound interest. "It is simply an ascertained debt upon which interest should be allowed as a recompense for its detention."

The accountants appealed, No. 105 January Term 1879, and alleged that the court erred in this decree.

At the audit, R. B. Phillips, administrator of William Phillips, deceased, made a claim upon a due-bill given by Thomson to William Phillips. The latter purchased a tract of land in Armstrong county, known as the "Templeton Tract," taking the deed in his own name. Mr. Thomson took a one-fourth interest in this tract,

[Roberts's Appeal.]

and gave Phillips his due-bill for $7964.07, and Phillips gave Thompson a receipt for this amount, in which he said: "In consideration of said amount paid to me by him, I hereby agree and bind myself to execute and deliver to him a deed, certifying that I hold the land above described in trust for him ($7964.07), with power to myself to sell any part of said lands, and account to said Thomson for proceeds." No deed was ever made, and no proceeds of this tract were ever accounted for to Thomson. Phillips died, leaving this and other land burdened with the statutory lien of vast debts.

The auditor reported that the Thomson estate was entitled to set off a claim against Phillips's estate against this and other demands; and that as Phillips had died largely in debt, and there were numerous suits pending against his administrators, they could not convey an unencumbered title, and it was therefore clear that nothing could be demanded of the Thomson estate without first tendering conveyances of the shares of the lands to which Thomson's estate was entitled freed from the statutory liens of Phillips's debts, and that consequently the claim must be disallowed. The claimant excepted and the court sustained the exceptions, saying:—

"Decedent, with Phillips and others, had a like interest in other lands in Clearfield and Armstrong counties, Pennsylvania. In payment of his share of the purchase-money in Armstrong county, decedent gave Phillips the due-bill for $7964.07. The title to these lands was also held by Phillips, who died before any conveyance was made to decedent of his undivided share. William Phillips at his death was found to be largely indebted. In view of these facts, the auditor disallowed the claim upon the ground of the indebtedness of Phillips to decedent for lands sold, and also for the reason that the claimants were not entitled to recover without first tendering conveyances of the shares to which decedent was entitled, freed from the statutory lien of the debts of said William Phillips. We agree with the auditor, that the debt due from Phillips to decedent for his proportion of the sales of land is a proper set-off; but we are of the opinion that the non-conveyance by Phillips of decedent's undivided share in the lands cannot be so regarded. A cross-demand of this character does not seem to be contemplated by the Defalcation Act of 1805, nor the current of decisions under it. The act has ever been liberally construed, and unliquidated cross-demands arising out of separate and distinct causes of action allowed to be set-off. But it must arise *ex contractu*, and be capable of liquidation by a jury."

The Guarantee Trust Company, administrator of the estate of Samuel Veazey, deceased, also made a claim for $135,000, the balance due upon eighteen notes of the European and North American Railway Company, drawn as follows:

"Bangor, Maine, May 10, 1870.

For value received, the European and North American Railway Company, by its president, authorized thereto by a vote of said company as principals, and the International Railway Construction and Transportation, by the trustees of said company or copartnership, authorized thereto as sureties, do promise to pay Charles V. Lord and Alfred Veazey, executors of Samuel Veazey, or bearer, the sum of seven thousand five hundred dollars, in equal proportions, in five, six, seven, eight, nine and ten years respectively, from December 1st 1869, at any bank in Bangor aforesaid; and in case any portion of the principal or interest of this note shall remain unpaid for six months after such portion has become due, then the whole of the said note shall become instantly due and payable, and collectible, as if on demand, with interest.

EUROPEAN & N. A. R. Co.,
By G. K. Jewett, President,
Principals.

[U. S. Stamp, $3.75.]   NOAH WOODS,
B. E. SMITH,
W. G. CASE,
Trustees, I. R'y C. & T. Co.,
Sureties."

On the 17th of January 1868, John Edgar Thomson, William G. Case, Benjamin E. Smith, G. K. Jewett, Noah Woods and others, numbering twenty-three in all, organized an association under the name of the International Railway Construction and Transportation Company. The articles of association of the company, provided that "its objects and purposes shall be the building, equipping and operating the European and North American Railway, under the construction contract and other contracts which have been made or may hereafter be made touching the said objects and purposes. And the said William G. Case, Benjamin E. Smith and Noah Woods, parties of the second part, are hereby created trustees for the purpose of carrying into effect these articles." All the property of the association was vested in the trustees, and the articles provided that the trust should be closed upon the "performance of the said construction and other contracts and building and equipping said railway," and that the property and effects of the association should then be distributed and divided among the members.

The European and North American Railway is about 205 miles in length, extending from Bangor to St. Johns, N. B. Another and different road, about 13 miles in length, extended from Bangor to Milford, nearly parallel with the European and North American Railway, and was called the Bangor, Oldtown and Milford Railroad. The entire capital stock of this latter railroad was

owned by Charles V. Lord and Alfred Veazey. Some of the officers of the European and North American Railway Company, considering it desirable that their company should own the Bangor, Oldtown and Milford Railroad, negotiations were entered into for its purchase between Noah Woods and G. K. Jewett and Messrs. Lord and Veazey. These negotiations resulted in the making of a written agreement bearing date the 27th of November 1869, which stipulated that "the said Lord and Veazey promise and agree with said Woods and Jewett to assign and transfer to them, or to such persons as the said Woods and Jewett shall indicate, the entire shares of all the capital stock of the Bangor, Oldtown and Milford Railroad Company, to wit, three thousand shares, the par value of which is forty-five dollars per share; said transfer and assignment to be as of the first day of December next. And said assignees to have said shares without any dividends or earnings, or profit or money on hand of said railroad, or which may be on hand or due up to the close of the last day of the present month of November, and said shares at the same time to be free from all the liabilities of said railroad which now exist or may exist up to and including said last day of November; meaning, that said shares shall be assigned and transferred as of said date, clear of all assets and liabilities, so that the said shares will on that day exactly and only represent the real and personal property and franchise of said corporation as the same exists at this time, excepting that the ordinary use of said road, till December 1st 1869, will belong to the present owners, as well as all earnings and profits as aforesaid; the said assignments and transfers of said stock to be delivered when said Woods and Jewett shall deliver to said Lord and Veazey the notes as described hereinafter; provided, such notes are delivered within the time in which said Woods and Jewett promise to deliver the same, as named hereinafter; and, in consideration of the promises of said Lord and Veazey, the said Woods and Jewett promise to take and receive said shares, and give for the same the sum of $135,000, payable in the manner following, to wit: By the notes of the European and North American Railway Company, as principals, and the International Railway Construction and Transportation Company, as sureties, the said last-named company being a joint stock company or copartnership; said notes to be so far authorized by the said companies that the same shall be binding on the said European and North American Railway Company as a corporation, and upon the individual members of said Construction and Transportation Company as a copartnership, said sum of $135,000 in such note to be payable, with interest annually and in equal proportions, in five, six, seven, eight, nine and ten years from date, to be dated the first day of December 1869."

Mr. Thomson never saw the agreement of November 27th 1869, but in a letter in 1869 wrote as follows·

[Roberts's Appeal.]

" December 29th 1869.

GENTLEMEN :—I am informed by you of the purchase of the Bangor, Oldtown and Milford Railroad, for and in behalf of the European and North American Railway company, to be paid for by the duly authorized note or notes of said railway company, the price being one hundred and thirty five thousand dollars ($135,000), and payable, one-fifth of the entire amount in five years from date of purchase, and one-fifth in each succeeding after the fifth year, until the whole amount is paid, with interest, to be paid annually, which note or notes I understand are to be signed as securities by the trustees of the International Railway Construction and Transportation Company. As a member of the said International Railway Construction and Transportation Company, I hereby approve of said purchase, and so far as it relates to myself, ratify and sanction the signing of said note or notes by the trustees of said company.          J. EDGAR THOMSON.

" To Messrs. G. K. JEWETT and NOAH WOODS."

The time for the payment of the notes had not expired, but they were alleged to have become due by reason of default in the payment of annual instalments of the principal and the whole sum was therefore claimed. The auditor, inter alia, reported :

" By this letter, Mr. Thomson approved and sanctioned the purchase of the railroad and the signing of the notes. Neither of these acts was void in itself; and the ratification or approval, whichever it may be called, is so far perfectly valid. The terms of payment, however, were somewhat different. There were to be six payments instead of five, extending over a corresponding series of years.

" Giving time to a principal, without consent of a surety, certainly discharges the latter, and so does any other material variation of the liability of the principal. Mr. Thomson, however, was not a surety. He was merely a partner acting by agents, who assumed the place and duties of sureties upon terms to which they assented. Mr. Thomson's action was simply approbatory of what was designed to be done, the purchase of the railroad stock. It may be observed, in passing, that here the extension of the time of payment is given to both principal and surety, by the very obligation by which that relation is created, and it is material, in this connection, to note that while Mr. Thomson's letter was written in December, 1869, the notes were not dated or delivered until May 10th 1870."

The auditor then allowed the claim. The accountants excepted, and the court overruled the exceptions, in an opinion, inter alia, saying: " While, therefore, the contract of suretyship assumed by the three trustees was not in its inception binding upon the copartnership trading as the International Railway Con-

[Roberts's Appeal.]

struction and Transportation Company, yet before or after its execution it cannot be doubted that it was competent for the members of the firm to ratify and approve the contract, and thereby binding upon the firm. And while each member of a copartnership, within the scope of its legitimate business, may render his copartners liable, for debts contracted with third parties, without notice of any private agreement to the contrary between the copartners, yet where the debt is contracted and liability assumed in an undertaking or enterprise foreign to the 'objects and purposes' of the copartnership, we think it requires the assent or ratification of each and every member of the firm before they can be held individually liable.

"But in the present case it appears that only thirteen members of the firm, including the decedent, assented to and ratified the contract entered into by their three associates. If all the members of the firm are not liable, are these thirteen? We think the question must be answered in the affirmative. Condensing the evidence, it appears that thirteen members of a firm agreed to and ratified a contract entered into by three of their copartners, in the name of and for the benefit of the firm; that, in consideration thereof, the contract was fully executed, and the property, the subject-matter of the contract, passed from the vendors and became part of the assets and estate of the copartnership. In view of these facts we are of the opinion that, although the copartnership as such is not liable as surety upon the promissory notes held by the estate of Samuel Veazey, deceased, yet the thirteen members of the firm are individually liable.

" All the parties to the contract relied upon this assurance and faith, and those who contracted as sureties must be held to the consequences of their act."

The accountants appealed, January Term 1879, No. 108, and alleged that the court erred in overruling these exceptions.

Claims were also made by Hugh Ryan, Edward D. Jewett, Joshua W. Hathaway, the Second National Bank, of Bangor, the Oakland National Bank and Mrs. Nancy Farnsworth, on notes of the International Railway and Construction and Transportation Company, in the following form:

"Bangor, April 28th 1871.

For value received, on demand from date, the International Railway Construction and Transportation Company, by the trustees of said company duly authorized, promise to pay to the order of N. Woods, at Second National Bank in Bangor, $2800, interest at rate of eight per cent. to be paid semi-annually.

Signed,          NOAH WOODS,
                 W. G. CASE,          } Trustees.
          By NOAH WOODS, Attorney.
Endorsed—N. WOODS, G. K. JEWETT."

The auditor admitted these claims in full. The trustees excepted, and the court overruled the exceptions and confirmed the report, saying:

"The auditors found that these were debts justly due and owing by said company, and that decedent, as a member, was liable therefor. In view of the evidence presented we discover no error in the findings of fact by the auditor, and therefore dismiss these exceptions."

Accountants appealed, No. 109, January term 1879, alleging that the court erred in confirming the report of the auditor.

All these appeals were argued together.

*W. A. Porter*, for appellants.—In regard to the claim of Mrs. Thomson and Mrs. Reed, it is not to be conceived that the testator intended his will to be so construed, as to entirely sweep away the effects of his residuary bequest. The uncertainty whether these claimants will require the whole income or not, makes the establishment and maintenance of the charity impossible during the life of either of them.

The policy of the law has always been against charging interest upon interest, and the claim in the Alexander estate should not have been allowed: Offston *v.* Yarmouth, 2 Salk. 449; Waring *v.* Cunliffe, 1 Vesey, Jr. 99; Pawling *v.* Pawling, 4 Yeates 220; English *v.* Harvey, 2 Rawle 309; McClelland's Ex'rs *v.* West, 20 P. F. Smith 183.

Encumbrances existing on the land, were a good defence to the Phillips claim: Coke *v.* Kelly, 13 S. & R. 165; Negley *v.* Lindsay, 17 P. F. Smith 229. The question of set-off was not raised. The simple question was, whether any action whatever could be maintained by Phillips or his representatives, after his failure to perform the contract on his part.

The notes purported to be signed by the European and N. A. Railway Co., as principals, and by Woods, Smith and Case, as sureties. If Mr. Thomson's letter made him liable at all, it could not be as a principal nor as a surety, for these categories had been filled up, but only as a guarantor, and not as a guarantor unless it were shown that the principal debtor had become insolvent: Rudy *v.* Wolf, 16 S. & R. 79; Johnston *v.* Chapman, 3 P. & W. 18; Kellogg *v.* Stockton, 5 Casey 460; Hoffman *v.* Bechtel, 2 P. F. Smith 190.

The notes contained this stipulation, of which, Mr. Thomson never was informed: "In case any portion of the principal or interest of this note shall remain unpaid for six months after such portion has become due, then the whole of the said note shall become instantly due and payable and collectible, as if on demand, and with interest." This was a most essential addition to the terms of the contract, so far as they had been communicated to

[Roberts's Appeal.]

Mr. Thomson. A surety might be willing to become liable for a debt payable during a course of years, at intervals of a year, but very unwilling, if liable to be called upon to pay the entire sum in a very few months. To write so important a condition as this in the bond, and to withhold all knowledge of it from the alleged surety, and then to expect to hold him liable as if he had assented to it, is at war with every decision yet rendered in the law of principal and surety: Bacon v. Chesney, 1 Starkie 153; Glyn v. Hertel, 8 Taunt. 208; Wright v. Johnson, 8 Wend. 513; Birckhead v. Brown, 5 Hill 634.

It is settled law, that no man can be held to have ratified that which has been done in his name, until he has had full knowledge of all the facts attending the transaction. There is no evidence whatever, that Mr. Thomson ever saw one of these notes, or that he ever knew the terms of his letter had been violated: Moore's Exr's v. Patterson, 4 Casey 505; Railroad v. Gazzam, 8 Id. 340; Pearsoll v. Chapin, 8 Wright 9.

All the partners did not assent to this contract, and none are bound: Parsons on Contracts 107; Livingstone v. Lynch, 4 Johns. Ch. 573, 596.

The trustees were not authorized to issue the notes, on which Ryan et. al. base their claims. The articles of association gave them no such authority. One of the trustees executed a power to the other two to act for him. He could not thus delegate his discretion, and the acts of the trustees were void: Sugden on Powers *223; Lewis on Trusts *296; McCready v. Guardians, 9 S. & R. 94; Johnston v. Bingham, 9 W. & S. 58.

*A. Sidney Biddle* and *George W. Biddle*, for Mrs. Thomson and Mrs. Reed.—It was manifestly the intent of the testator, as appears by the first codicil, that Mrs. Reed was to be treated as if she were his child and he had died intestate, and the second codicil briefly reaffirms the first. There being no controversy between Mrs. Thomson and Mrs. Reed, there is no reason why Mrs. Thomson should not appoint the income: Kinter v. Jenks, 7 Wright 445; Second Presbyterian Church v. Disbrow, 2 P. F. Smith 219; Jauretsche v. Proctor, 12 Wright 466; Pennock's Appeal, 8 Harris 268. The charity is postponed by the first codicil, and the second having been made within one month of testator's death, could not restore it: Act of April 26th 1855, Pamph. L. 332.

*MacGregor J. Mitcheson*, for Alexander's Estate.—We did not insist upon compound interest, but for simple interest upon a trust fund found to be due by a trustee to a *cestui que trust*: Lamb's Appeal, 8 P. F. Smith 146; Hughes's Appeal, 3 Id. 500; In re Harland's Accounts, 5 Rawle 333; Commonwealth v. Miller,

11 NORRIS—27

8 S. & R.458; Schaeffer's Estate, 9 Id. 268; Fries *v.* Watson, 5 Id. 220.

*W. H. Drayton*, for Phillips's Estate.—Phillips could have demanded the due-bill at any time, in anticipation of giving the deed of trust, and Thomson, paying his money, might at any time have required his deed, but he could not have demanded a deed without paying the due-bill, and Phillips was certainly in no default in not proffering a deed of trust until the due-bill was paid.  Both parties died, leaving the transaction as stated, and under the law and equity of the case, their representatives stand in their shoes, except that they must each look in different directions for what is due them.  Phillips's personal representative must look to Thomson's personal representative, in the first instance, for the due bill, and Thomson's heirs to Phillips's heirs for the declaration of trust when the due-bill is paid: Roland *v.* Tiernan, 8 W. & S. 193.

The claim of the Thomson estate was not the proper subject of a set-off: Wharton *v.* Douglass, 26 P. F. Smith 273; Harris *v.* Rapp, 2 W. N. C. 595.  Phillips's insolvency was a bar to any claim of set-off: Bosler *v.* Exchange Bank, 4 Barr 32; Appeal of Farmers' and Mechanics' Bank, 12 Wright 57.

*Henry M. Dechert*, for Veazey's Estate and Ryan et al.—When Mr. Thomson approved the purchase, as he did by his letters to his partners, it was as to him a partnership transaction, even if outside the regular business of the association, and "he was as much bound by the acts and declarations of his partners as to that transaction, as if it were one of the ordinary and customary acts of the association:" Sandilands *v.* March, 2 B. & Ald. 673; Windship *v.* Burk, 5 Pet. 529.

Although articles may deny to one partner the right to bind the firm by his separate act, within the scope of his business, he has the power, for the world cannot know and are not to be affected by such limitations.  Each partner is the agent of his partners in all matters within the scope of the firm business.  A participant in profits directly as such is, as to third persons, a partner, whatever may be the arrangement between the partners: Edwards *v.* Tracy, 12 P. F. Smith 374; Kramer *v.* Arthurs, 7 Barr 165; Drennen *v.* House, 5 Wright 30.

Chief Justice SHARSWOOD delivered the opinion of the court, March 29th 1880.

This is an appeal by the administrators of the estate and the trustees under the will of John Edgar Thomson from a decree of the Orphans' Court on the settlement of the account of the administrators of his estate.  The appellants adopted the novel practice of entering five appeals—a separate appeal for each claim on

the estate with the decision of which they were dissatisfied. It was not only novel but dangerous. The same party is clearly entitled to but one appeal from the same decree. Upon the assignment of his errors, he is conclusively presumed to have no other ground of complaint against the decree, and had a motion been made to dismiss all the appeals but the first, the appellants would have had no recourse but the interposition of the court in their discretion to correct their mistake. We will make such a decree as will put the record right and do justice in the matter of costs.

1. The first question we will consider is in the matter of the claim of Mrs. Lavinia F. Thomson and Mrs. Charlotte F. Reed to the income of the estate.

The will of Mr. Thomson with the two codicils is certainly a very peculiar one. It will be in vain to look for precedents in the books which can throw any light upon its construction. In the will itself there would not be much difficulty. It is plain that by "proceeds" he meant "income," and it is equally plain that he intended that the legatees—though named subsequently to the provisions for his wife and niece—should receive their bequests and legacies independently of those provisions. Subject then to the payment of these legacies his wife was to have so much of the income of his estate as in her sole discretion she might deem necessary for the maintenance of herself and her niece in such style as she might think best to promote their happiness and comfort during her lifetime. She would have the right to receive the whole remaining income if she required it. Neither the trustees under the will nor the court upon any principle of law or equity could say for her what ought to be the style in which she should live or how much would be a sufficient allowance for any style she might choose. Then if her niece should survive her, he directed the sum of two thousand dollars annually to be paid to her as long as she might live. The trustees were to appropiate the remainder of the net income to the purpose of a charity. It is true he describes it as "the remainder of the net income of my estate, after the payment above specified or so much of it as may be judiciously applied." This cannot give the trustees the right to limit the claim of his wife to what they might consider judicious. It is evident that Mr. Thomson had the most unbounded confidence in his wife, and might well consider that she would not claim the whole of the remainder so that there would still be something to apply to the charity. It was not the trustees but Mrs. Thomson who was to make the judicious application.

The first codicil is in these words: "I desire my dear niece, Lottie Foster, but to whom I cherish the feelings of a father, to be so treated and regarded in the law as if she really were my child, receiving during her lifetime such income from my estate as if she really were my child, and I postpone the operation of the trusts of my

will so as to fully effect this result, until her decease, upon which event they are forthwith to take full effect as expressed in the will." The first remark to be made as to this codicil is that it does not mention his wife. Not a syllable in it indicates an intention to revoke or modify the provision in the will for her. Yet to give the words their strict interpretation, it would necessarily reduce her allowance to one-third of the income. It would seem that the intention was only to modify the provision of the will as to his niece. Instead of an annuity of two thousand dollars if she survived her aunt, he declared that she was to be so treated and regarded in the law as if she was really his child, receiving during her lifetime such income from his estate as if she were really his child. That is, that not absolutely but during her lifetime she should be entitled to receive the whole income of his estate. Accordingly, the operation of the trusts for the charity is postponed until her decease. We cannot see that the second codicil varies materially the result. He declares that he wished his niece to be considered as his daughter, and to take out of the income of his estate all that she required to make her more than comfortable in her housekeeping during her lifetime, and then thinking perhaps that she might not require the whole of the income, he adds: "I do not desire to postpone by it the operations of the trusts of my will, except so far as may be necessary to secure the above object."

Another construction of the first codicil which interprets it so as to reduce the provision for Mrs. Thomson to one-third only of the net income to her during her life, and to give the remaining two thirds to his niece during her aunt's life, and the whole at the period of her death, has already been adverted to. One or other of these constructions must be the true one. Whichever construction prevails, the appellants have no cause of complaint. They have no right to any portion of the income during the lives of Mrs. Thomson and Mrs. Reed, except what may remain after what they have pleased to require. Neither Mrs. Thomson nor Mrs. Reed have appealed from this decree. They are satisfied with the decree below as between themselves. As to them, it has passed *in rem adjudicatam*. Practically, under either construction, they are entitled to receive the whole income during their joint lives and the life of the survivor. The appellants have failed to convince us that the charity they represent is at all injured by the decree below. The only party who might have been injured has not appealed but acquiesces. As to her, the decree below is conclusive, and the trustees will be fully protected in making their payments according to it.

2. The next complaint which we will consider, is as to the decision of the court below upon the claim of Mrs. Ellen B. A. Mitcheson.

This exception appears to have been argued in the court below,

as it was here solely on the ground that it was an allowance of interest upon interest. There is certainly no good reason why a man who wrongfully withholds the payment of interest—due upon an admitted debt—should not also pay interest upon interest. The interest is the money of the creditor as well as the principal, and if it is wrongfully withheld, the wrongdoer should pay for the use of it. All interest is but hire for the use of money. No one questions the law or the justice of compelling the hirer of property other than money at a certain annual sum to pay interest on such sum. Interest is recoverable on rents agreed to be paid for the use of land. It is certainly not usury. Lord Thurlow said in War- ing v. Cunliff, 1 Vesey, Jr. 99 : " My opinion is in favor of interest upon interest, because I do not see any reason, if a man does not pay interest when he ought, why he should not pay interest for that also." Chief Justice TILGHMAN (5 S. & R. 222), speak- ing of allowing interest upon interest in the revival of judgment, says : " Nor is there anything against equity in it. The payment of interest is occasioned by the default of the defendant. It is equitable that he should pay interest on the whole sum detained from the plaintiff." It must be admitted, however, that the law is settled that unless there is a special agreement or an account stated and a balance struck interest upon interest cannot be recovered. This is the undoubted rule as between debtor and creditor. We think, however, the rule is not applicable with so much strictness as between trustee and cestui que trust. The money as received by the trustee is the money of the cestui que trust. If sufficiently ear-marked the law follows it. It is a breach of duty in the trustee to mix it with his own funds. It is his plain duty to pay it to the cestui que trust as received—and if he has made profit or interest—that profit or interest belongs to the cestui que trust. The onus is on the trustee to show that it has been kept apart and not used by him. These considerations fully sustain the ruling of the learned court below. But that ruling may be sustained upon another ground. When the pay- ment was made by Mr. Thomson, it was in fact a partial payment on account. He may have intended to direct the application of it to the principal sum. It is probable he did. But it does not appear that he made any such express application. Certain it is that Mrs. Mitcheson did not so receive it. The receipt she gave and which was accepted was expressly on account. In all cases of partial payment, it is the law which makes the application. It may be doubted whether the debtor has a right to make any other application. It is only where there is more than one debt that the debtor has a right in the first instance to direct to which debt the payment shall be applied. Mrs. Mitcheson received the money as a partial payment, she had a right to refuse to receive it, and could therefore make her own terms. The rule as to

partial payments is well settled, and there is no reason why it should not be applied to this case. According to that rule the application is to be made first to the interest then due, and the balance to the reduction of the principal. This would in this case leave the unpaid interest, still standing, as a part of the principal remaining due, and would of course bear interest: Spires *v.* Hamot, 8 W. & S. 18, and the authorities there cited, to which may be added Moore *v.* Kiff, 28 P. F. Smith 96. This relieves the case of any difficulty.

3. The next question presented is that which arises upon the claim of the administrator of the estate of William Phillips, deceased.

The transaction between Thomson and Phillips in regard to the Templeton lands was evidently a cash transaction—so intended and by strong implication manifest on the face of the papers. Phillips had paid in cash for the land $31,856.30. Thomson agreed to purchase an interest of one-fourth, and to pay in cash $7964.07. Phillips gave him a receipt in full as for cash, and then took, not a security payable at a future day, but a simple due-bill payable at once. It was the same, precisely, as if Thomson had actually paid in coin, and Phillips had immediately loaned it to him, taking his due-bill or note payable on demand. It was not therefore a case in which a failure to convey would be a good equitable defence as in the ordinary case of securities given for purchase-money. No demand was ever made by Thomson of Phillips in his lifetime for a deed declaring the trust. There was no default in Phillips. His death renders a literal compliance impossible. But Thomson's estate cannot suffer. The receipt signed by Phillips is as effectual though perhaps not as formal a declaration as could be made. It can be proved by the subscribing witness and put on record. Had a formal declaration of trust been given and recorded, it would not have prevented Phillips from selling. A power for that purpose was reserved. Indeed it was the reason why Phillips retained the legal title. The record of this receipt will secure Thomson's estate from any conveyance by the heirs, and if any creditor should proceed to levy and sell it will be notice to the sheriff's vendee that one-fourth interest in the land belonged to Thomson, and could not be sold for Phillips's debt. On payment of this due-bill, Thomson's estate will have a right to an absolute deed in fee from Phillips's heirs—discharged of the lien of his debts. Why then should Thomson's estate withhold the money, the cash he admitted to be presently due? The case of Roland *v.* Tiernan, 8 W. & S. 193, is entirely in point.

4.–5. The only claims which remain to be considered are those of administrators of Samuel Veazey, deceased, and of the Oakland National Bank and others.

We are of opinion that the learned court below were right in

sustaining the exceptions to the auditor's report, and in holding that the contract for the purchase of the stock of the Bangor, Oldtown and Milford Railroad was not within the scope of the articles of association of the International Railway Construction and Transportation Company. The object of this latter company, which was unincorporated, was expressed to be "the building, equipping and operating the European and North American Railway." The road whose stock was bought was a competing road, running parallel with the latter road for a short distance. But however desirable it might be for the International to own this road and thus prevent competition, we fail to see that it was within the scope and objects of the International. That was strictly confined to a very definite purpose, and to suppose that the trustees could bind the copartners to purchase any other road seems very far out of its proper line. Indeed, the parties evidently so thought themselves, for they stipulated "to procure a writing in which the individual members should authorize the same with their liability." There were in all twenty-three members of the International, and without scrutinizing particularly the terms of Mr. Thomson's letter of December 29th 1869, we may concede that he, with thirteen others, did authorize the contract. The question then simply is, whether he is bound without the concurrence of all his copartners. If he is, the effect undoubtedly is that he is individually responsible for the whole amount, with the right to call upon the other thirteen for contributions. But was this his agreement? We think not. It is evident that all the members were to be individually bound or none. There is no evidence that the fact that only a part of the members had agreed to be bound on the clause of the contract entered into for the purchase, by which it was stipulated that less than the whole number might agree, was ever brought to the knowledge of Mr. Thomson, or assented to and ratified by him. How then, without evidence of knowledge, could he be estopped? If Mr. Thomson had been the only one who assented, is it possible that he would have been bound individually with no right to call upon any of his associates for contribution? We think it is too clear for argument. Mr. Thomson's letter is confirmatory of this view. He says that the purchase was to be paid for by the *duly authorized* note or notes of the said company. Now if the contract was not within the scope of the partnership, the notes were not the duly authorized notes of the company unless authorized by all the parties. Unless all the parties were bound the partnership was not bound. We think, therefore, the learned court below erred in awarding in favor of the claim. As to the claims of the Oakland National Bank and others, we affirm the decree upon the report of the auditor and opinion of the learned court below.

> Decree reversed as to the claims of the administrators of Samuel Veazey, deceased, the Oakland National

[Roberts's Appeal.]

Bank, Joshua W. Hathaway, Edward D. Jewett, Hugh Ryan and Mrs. Nancy Farnsworth, and affirmed as to the residue. And it is ordered that the appeals numbered 106, 107, 108 and 109, of January Term 1879, be dismissed at the costs of the appellants; that the style of this appeal No. 105, be amended by striking therefrom the words, "on the claim of Mrs. Ellen B. A. Mitcheson;" that all the assignments be filed in this case, and that the costs of this appeal be paid by the appellants from the estate of J. Edgar Thomson.

PER CURIAM.—And now, April 2d 1880, it is ordered that the decree heretofore entered in the above case be amended by striking therefrom the names of the Oakland National Bank, Mrs. Nancy Farnsworth, Hugh Ryan, Joshua W. Hathaway and Edward D. Jewett, and that as to the claims of those parties respectively, and of the Second National Bank of Bangor, the decree of the Orphans' Court be and the same is hereby affirmed.